IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TAMERIA LONG, on behalf of | ) | CASE NO. 1:13-cv-00576 |
| D.C.P., Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Tameria Long ("Plaintiff") on behalf of her son, D.C.P., Jr., a minor,

("Claimant"), seeks judicial review of the final decision of the Defendant, Commissioner of

Social Security ("Commissioner"), denying Claimant's application for Supplemental Security

Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. (The "Act").

Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

As more fully explained below, the Commissioner's decision is **AFFIRMED**.

## I.  Procedural History

On or about November 27, 2009, Claimant's mother filed an application for SSI on behalf

of Claimant.  Tr. 61-62, 113-119.  Plaintiff has alleged that Claimant's disability is based on

speech problems, learning disabilities, and depression with an alleged disability onset date of

September 1, 2004.[1]  Tr. 45, 61-62, 63, 72, 113-119, 132.  The claim was denied initially and

---

[1] The ALJ found that Claimant had alleged a disability onset date of September 1, 2004.  Tr. 18.  This finding is supported by the record.  *See* Disability Report – Field Office report (Tr. 132).  In the "procedural history" section in her Brief on the Merits, Plaintiff states that Claimant's alleged disability onset date was July 21, 1998.  Doc. 12, p. 3. This date is also supported by the record.  *See* Application Summary for Supplemental Security Income (Tr. 113). Plaintiff does not raise a specific objection to the ALJ's finding with respect to the alleged disability onset date.

upon reconsideration.  Tr. 61-62, 63-65, 72-78.    A hearing was requested (Tr. 79) and, on

October 26, 2011, a hearing was held before Administrative Law Judge Ben Barnett (the "ALJ")

(Tr. 37-60).  In his December 23, 2011, decision, the ALJ determined that Claimant was not

disabled or entitled to SSI benefits.  Tr. 15-36.  Plaintiff requested review of the ALJ's decision

by the Appeals Council (Tr. 14) and, on February 12, 2013, the Appeals Council denied review,

making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.  On March 18, 2013,

Plaintiff filed the instant action on behalf of Claimant seeking review of the Commissioner's

decision.  Doc. 1.

## II. Evidence

### A.  Personal and Educational Evidence[2]

Claimant was born in 1998.  Tr. 113.  He was 13 years old at the time of the hearing.  Tr.

43.  He lived with his mother and two sisters, who were ages 6 and 16.  Tr. 45.  Claimant had

two teachers in his classroom and attended speech therapy.  Tr. 46.  Claimant's mother reported

that Claimant's grades were usually Cs with some Ds.  Tr. 46.  At the beginning of the school

year, Claimant was in more regular classes than learning disability classes.  Tr. 55-56.  Plaintiff

felt that all of Claimant's classes should be learning disability classes because he was still

struggling.  Tr. 55-56.  After Plaintiff spoke with the principal, Claimant was placed in more

learning disability classes but not all of his classes were learning disability classes.[3] Tr. 55-56.

---

Thus, the Court will accept the ALJ's finding that September 1, 2004, is Claimant's alleged disability onset date.

[2] Additional information regarding testing and teacher evaluations is summarized below in Section II.D.

[3] During the hearing, Claimant's counsel indicated that, based on a November 2010, teacher questionnaire, Claimant was in a full-time self-contained classroom for six periods each day, with a student-teacher ratio of 8 to 2.  Tr. 57. According to the November 9, 2010, IEP, Claimant was in regular classes for music, art, library, gym, and computer. Tr. 284.

B.    **Testimonial Evidence**

Plaintiff was represented by counsel and testified at the hearing.[4]  Tr. 45-59.  Plaintiff stated that Claimant plays video games for fun.  Tr. 47.  She reported that Claimant does not hang around with friends.[5]  Tr. 47.  He has an 11 year old cousin with whom he plays once or twice each month. Tr. 47, 50-51.  He also plays with his 6 year old sister daily.  Tr. 47, 51.   Claimant has expressed an interest in playing ball but has indicated he does not know how.  Tr. 47.  Plaintiff has asked her son if he would like to sign up for sports.  Tr. 47-48.  At first he says yes.  Tr. 48.  However, he later changes his mind and does not want to sign up.  Tr. 47-48.  Plaintiff stated that Claimant will not participate in gym class.[6]  Tr. 48.

Plaintiff indicated that Claimant has difficulties with his speech.  Tr. 48.  He has a hard time pronouncing words.  Tr. 48-49.  During the hearing, Claimant's attorney noted that there were records that indicated that Claimant was tested for autism but the test results showed that Claimant is not autistic.  Tr. 53-54.  Later during the hearing, Plaintiff indicated she was not aware of those results and also indicated that Claimant's doctor stated that Claimant was showing some signs of Asperger disorder and it was Plaintiff's understanding that an additional evaluation was going to be conducted.  Tr. 55.

Because Plaintiff felt that Claimant was "down a lot," did not go outside and play with other kids, and looked sad, Plaintiff was concerned and sought counseling for her son.  Tr. 49.

---

[4] Claimant was not present during the hearing.  Tr. 39, 41.

[5] In contrast to Plaintiff's statements at the hearing that Claimant does not have friends that he hangs around with, an August 9, 2010, Applewood Centers Mental Health Assessment Service Report reflects that Plaintiff reported that Claimant does have a few friends.  Tr. 358.

[6]  In contrast to Plaintiff's statements at the hearing that Claimant does not participate in gym, an August 9, 2010, Applewood Centers Mental Health Assessment Service Report reflects that Claimant likes gym.  Tr. 360.

Plaintiff believes that her son may be feeling depressed because he struggles in school.  Tr. 50.
Claimant sees a counselor at MetroHealth.  Tr. 53.  He does not take medication for depression.[7]
Tr. 50.

      Plaintiff indicated that Claimant is always washing his hands. Tr. 51-52.  He gets upset if
someone touches his food or if some of his food touches other food.  Tr. 52.  If someone touches
his food, Claimant wants it thrown in the garbage.  Tr. 52.  Claimant goes to bed when asked to
but he does not always fall asleep right away and he sometimes wakes up during the night.  Tr.
52.

      Plaintiff indicated that Claimant is not really an angry child.  Tr. 53.  However, Plaintiff
noted one instance where Claimant became upset during an argument with Plaintiff and Claimant
hit a wall.  Tr. 52.  Plaintiff indicated that Claimant does get upset if she talks about Claimant's
father.  Tr. 52-53.  Plaintiff believes that Claimant's problems are related in part to his
relationship with his dad as well as his struggles in school.  Tr. 53.  Plaintiff reported having a
good relationship with Claimant.  Tr. 54.

**C.**     **Medical Evidence**

    **1.**     **Opinion evidence**

      Plaintiff challenges the ALJ's reliance upon opinions rendered by consultative examining
psychologist Michael B. Leach, Ph.D., on April 30, 2010, and state agency reviewing physicians
in June 2010[8] and September of 2010.[9]  Doc. 12, pp. 13-14.  Accordingly, their opinions are
summarized below.

---

[7] Although worse in the past, Claimant experiences headaches about once a month for which he takes Motrin.  Tr. 50,
58.

[8] John L. Mormol, M.D., Melissa Hall, M.A., C.C.C./S.L.P., and Frank Orosz, Ph.D, all signed the same June 2010
Childhood Disability Evaluation Form.  Tr. 306.  Dr. Mormol signed the Evaluation Form on June 16, 2010, as the
"consultant with overall responsibility."  Tr. 306.  Ms. Hall signed the Evaluation Form on March 4, 2010, as an
"additional consultant" and, on June 7, 2010, Dr. Orosz signed the Evaluation Form as an "additional consultant."

### a.  Consultative examining psychologist, Michael B. Leach, Ph.D.

On April 30, 2010, Michael B. Leach, Ph.D., conducted a consultative psychological evaluation and prepared a Disability Assessment Report.  Tr. 300-304.  At the time of the evaluation, Claimant was 11 years old and in the sixth grade.  Tr.  300.  Dr. Leach noted that, although he had only received 2 pages of the ETR ("ETR" or "Evaluation Team Report"), he was able to note that Claimant suffered from borderline intellectual functioning.  Tr. 301.  Claimant's mother reported that Claimant had an IEP through school for academic struggles.  Tr. 303.  Claimant was taking no prescription medication.  Tr. 301.

Dr. Leach indicated that Claimant was observed sitting quietly while in the waiting room; he was clean and neat; he appeared happy, pleasant, and somewhat shy (but cooperative).  Tr. 301, 302.  Claimant put forth a good effort to interact and there was no evidence of any attention deficits or off-task behavior.  Tr. 301-302.  Although Claimant's speech was simplistic and concrete, he did not exhibit any significant speech problems.  Tr. 302.  Dr. Leach indicated that Claimant's speech was "100% intelligible in known and unknown contexts."  Tr. 302.  Claimant was able to understand simple questions and instructions but had difficulty following multi-step or complex instructions.  Tr. 302.  Dr. Leach indicated that there were no signs of "tangentiality or loose associations and no evidence of speech or language disorders."  Tr. 302.

Dr. Leach also indicated that Claimant appeared friendly and happy and there was no evidence of depression.  Tr. 302.  Claimant maintained good eye contact, denied crying spells and had normal appetite and sleep patterns.  Tr. 302.  Plaintiff also denied any evidence of mania or

---

Tr. 306.

[9] Louis Goorey, M.D., Marianne Collins, Ph.D., and Lisa Lynch, M.A., C.C.C./S.L.P., all signed the same September 2010 Childhood Disability Evaluation Form.  Tr. 368.  Dr. Goorey signed the Evaluation Form on September 30, 2010, as the "consultant with overall responsibility."  Tr. 368. Dr. Collins signed the Evaluation Form on September 22, 2010, as an "additional consultant and, on September 17, 2010, Ms. Lynch signed the Evaluation Form as an "additional consultant."  Tr. 368.

depression.  Tr. 302.  Dr. Leach stated that Claimant interacted well with his mother and the examiner.  Tr. 302.

As far as daily activities, Dr. Leach's report reflects that Claimant walks to and from school; when he arrives home from school he plays; his chores include cleaning his room and sweeping his floor but sometimes he refuses; he socializes with his cousin and neighborhood friends; he cares for his personal hygiene but needs constant reminders; he watches television; he enjoys playing video games, playing on the computer, playing football, and playing outside with neighborhood friends.  Tr. 303.

Dr. Leach diagnosed Claimant with borderline intellectual functioning and assigned a GAF of 70.[10]  Tr. 303.  He rated Claimant's ability to function independently, appropriately, and effectively as follows: (1) *cognition* was moderately impaired by borderline IQ; (2) *social development* was moderately impaired due to shyness and low IQ; (3) *communication* was mildly impaired by simplistic speech associated with low IQ; (4) *personal and behavioral development* was mildly impaired by low IQ; and (5) *motor development* and *concentration and persistence* were not impaired.  Tr.  304.

**b.  State agency reviewing physicians**

In the June 2010 Childhood Disability Evaluation Form, the state agency reviewers indicated that Claimant had language impairments and borderline intellectual functioning.  Tr. 305.  They concluded that Claimant's impairment(s) did not meet, medically equal, or functionally equal the Listings.  Tr. 305-306.  In assessing whether Claimant's impairments

---

[10] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

functionally equaled the Listings, the state agency reviewers assessed Claimant's degree of limitation in the six domains.  Tr. 307-310.  They opined that the Claimant had marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks and in interacting and relating with others; and no limitations in moving about and manipulating objects, caring for yourself, and health and physical well-being.  Tr. 307-310.

In the September 2010 Childhood Disability Evaluation Form, the state agency reviewers indicated that Claimant had language impairments, borderline intellectual functioning, conduct disorder, and depression.[11] Tr. 366.  They concluded that Claimant's impairment(s) did not meet the duration requirement.[12]  Tr. 366-367.   In assessing whether Claimant's impairments functionally equaled the Listings, the state agency reviewers assessed Claimant's degree of limitation in the six domains.  Tr. 307-310.  They opined that the Claimant had marked limitations in acquiring and using information; less than marked limitations in attending and completing tasks and in interacting and relating with others; and no limitations in moving about and manipulating objects, caring for yourself, and health and physical well-being.  Tr. 307-310.

### 2.    Treatment records

During a July 9, 2010, visit with pediatrician Dr. Deepti P. Bhat of MetroHealth, Dr. Bhat noted that Claimant had a learning disability and exhibited symptoms suggestive of depression. Tr. 347.  Dr. Bhat referred Claimant to child psychiatry and instructed Claimant's mother to bring the results of the psychological evaluation when they followed up with Dr. Carlin.  Tr. 345-347. On August 4, 2010, Claimant met with Dr. Susan A. Carlin of MetroHealth.  Tr. 343.  Claimant's

---

[11] The state agency reviewers noted that, initially Claimant's mother had alleged learning and speech disabilities.  Tr. 372.  However, on reconsideration, Claimant's mother indicated that Claimant had started to show signs of depression.  Tr. 372.

[12] While the state agency reviewers indicated that Claimant did not meet a Listing because his impairments failed to meet the duration requirement, in the section explaining their findings, the state agency reviewers also indicated that they had reviewed the file and affirmed the June 16, 2010, Childhood Disability Evaluation Form.  Tr. 372.

mother reported that Claimant had an appointment at Applewood Centers but would prefer a referral for him at MetroHealth.  Tr. 343.  Claimant's mother felt that Claimant could benefit from counseling.  Tr. 343.  Dr. Carlin advised Claimant and his mother that Claimant should keep his appointment at Applewood and call after his appointment.  Tr. 343.

On August 9, 2010, Applewood completed a Mental Health Assessment Report.  Tr. 353-366.  Jodie Beaver, LPCC, completed the Assessment.  Tr. 366.  In her summary, she stated that Claimant's presenting problems included his reported depressive symptoms for more than 6 months, with the problems affecting him in all settings.  Tr. 365.  She indicated that Claimant had no history of prior counseling.  Tr. 365.  Ms. Beaver's diagnostic impressions were that Claimant denied feeling sad but she noted that his mother said he often appeared sad; Claimant had trouble concentrating; he was irritable; he was withdrawn; he had lowered self-esteem; he needed reminders for hygiene tasks; he could be disobedient and lie; and he was a picky eater.  Tr. 365.  Ms. Beaver recommended counseling and no further diagnostic exams, tests or evaluations.  Tr. 365.

On January 11, 2011, Claimant began behavioral health counseling and therapy with Dr. Nanet Lopez-Cordova, Psy.D., of MetroHealth and continued therapy with Dr. Lopez through at least August 2011.  Tr. 379, 424-425.  Dr. Lopez's impressions were that Claimant presented "as a shy, withdrawn pre teen.  Despite his disappointment, regarding his father's no show in Christmas he was cooperative and seemed interested in sharing his thoughts and feelings."  Tr. 425.  Her diagnoses included major depressive disorder, single episode, mild; mixed receptive-expressive language disorder; reading disorder; mathematic disorder; and disorder of written expression.  Tr. 425.  During the course of treatment, Dr. Lopez indicated that, although Claimant had difficulties socializing outside of his family, he had the capacity to interact and learn new

8

social skills. Tr. 395, 405, 410. As Claimant continued therapy, treatment notes indicate that he started to open up more to his therapist and his mother. Tr. 395, 400, 405.

Claimant's mother felt that therapy was not helping enough and, on June 28, 2011, Claimant saw Dr. Kamal-Neil Dass, D.O., a psychiatrist with MetroHealth. Tr. 389-390. Claimant's mother reported that Claimant was still "off to himself." Tr. 389. She indicated that Claimant did go outside sometimes but most of the time he stayed by himself in his room. Tr. 389. His appetite had decreased. Tr. 389. She reported that, when Claimant's friends came around, he did not want to be bothered. Tr. 389. Claimant denied being depressed and disagreed with his mother's observations. Tr. 389. School was reportedly going ok but Claimant indicated that he often did not want to go to school. Tr. 389. Claimant's grades had improved from Ds to Bs and Cs; his teacher had no complaints; and he was doing his class work and homework. Tr. 389-390. Dr. Dass indicated that Claimant was neat, clean and cooperative. Tr. 390. His speech was within normal limits of "rate and volume, but with paucity of content." Tr. 390. Claimant's mood was "good" with his affect "blunted to flat." Tr. 390. Claimant's thoughts were logical in form and content and his memory and concentration were within normal limits. Tr. 390.

Dr. Dass diagnosed Claimant with "MDD, mild, single episode; R/O Asperger's D/O; R/O OCD vs other Anxiety D/O. Borderline Intellectual Functioning, FSIQ = 71." Tr. 390. Dr. Dass recommended that Claimant continue therapy with Dr. Lopez and indicated that he would discuss the case further with Dr. Lopez before deciding whether medication would be needed. Tr. 390. He also recommended psychological testing to rule out ASD. Tr. 390. Based on his discussions with Dr. Lopez, Dr. Dass noted that Dr. Lopez did not feel that Claimant needed medication at that time and she agreed to administer the Childhood Autism Rating Scale (C.A.R.S.) and refer Claimant for psychological testing if needed. Tr. 390.

Dr. Lopez administered the C.A.R.S. to identify autism and symptom severity.  Tr. 385.
On July 5, 2011, Dr. Lopez reported that Claimant scored in the "Non Autistic autism range."  Tr.
385.  She noted, however, that Claimant presented language, cognitive and social delays which
may have had an impact on his presentation.  Tr. 385.   Dr. Lopez also noted that Claimant's
mother reported that Claimant was improving and seemed able to communicate with others more
spontaneously.  Tr. 385.  On August 30, 2011, Claimant saw Dr. Lopez again for therapy and,
during that session, Claimant's mother reported that she felt that Claimant may be depressed
and/or presenting a pervasive disorder and she was interested in having Claimant assessed for
PDD (pervasive developmental disorder).  Tr. 379.  Claimant's mother also expressed concerns
with respect to Claimant's placement in special classes without special education services.  Tr.
379.  Dr. Lopez provided Claimant's mother the name of an attorney to speak with regarding the
classroom issues.  Tr. 379.  Dr. Lopez also referred Claimant for an ADOS (Autism Diagnostic
Observation Scale) evaluation.  Tr. 380.

On November 9, 2011, Lisa Ramirez, Ph.D., met with Claimant to complete the ADOS.
Tr. 429-433.  Dr. Ramirez concluded that, while Claimant "exhibits some symptoms associated
with Pervasive Developmental Disorders (PDD), there is not enough evidence to support that
these behaviors are associated with PDD and not secondary to depression or social anxiety."  Tr.
431.  However, one of her diagnoses included PDD-NOS.  Tr. 431.  Additionally, Dr. Ramirez
diagnosed Claimant with Major Depressive Disorder, Single Episode, Mild; Mixed Receptive-
Expressive Disorder; Reading Disorder; Mathematic Disorder; and Disorder of Written
Expression.  Tr. 431.  She assessed a GAF score of 60.[13]  Tr. 431.

---

[13] GAF Global Assessment of Functioning) considers psychological, social and occupational functioning on a
hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical
Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric
Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school functioning.  *Id.*

**D.**     **Educational records**

**1.**     **Evaluation Team Report and Testing**

In October and November of 2009, the Cleveland Municipal School District prepared an Evaluation Team Report.  Tr. 179-222.  As part of the evaluation, various tests were administered. On October 14, 2009, School Psychologist Bill Carter ("Carter") administered the Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV).  Tr. 179.  The results of that test were: full scale IQ of 71 (borderline range); verbal comprehension score of 69 (extremely low range); perceptual reasoning score of 75 (borderline range); working memory score of 83 (low average range); and processing speed score of 80 (low average range).  Tr. 179.

Carter also administered the Kaufman Test of Education Achievement-Second Edition (KTEA-II) over two sessions, beginning on October 22, 2009, and concluding on October 27, 2009.  Tr. 181.  The KTEA-II is used to assess reading, mathematics, oral language, and written language.  Tr. 181.  Claimant scored below average in each of the categories.  Tr. 181-182.

On November 2, 2009, Claimant was assessed for speech/language skills.  Tr. 184.  On the Oral and Written Language Scales (OWLS), Claimant scored an 82 for listening comprehension (3 years below grade level) and 52 for oral expression (5 years below grade level).  Tr. 184.  It was recommended that Claimant attend speech and language therapy once each week for the remainder of the school year.  Tr. 184.

The Behavior Assessment System for Children, Second Edition (BASC-II), which is designed to facilitate differential diagnosis and classification of a variety of emotional and behavioral disorders of children and to aid in the design of treatment plans, was also administered. Tr. 186-187.  On the BASC-II , Teaching Rating Scales (TRS-C) portion of the assessment, Claimant scored in the clinically significant range for withdrawal; low range for attention problems and executive functioning and negative emotionality; at risk range for adaptive

11

leadership; and average range for all other areas.  Tr. 186.  On the BASC-II, Parent Rating Scales

(PRS-C) portion of the assessment, Claimant scored in the clinically significant range for

atypicality and withdrawal, social skills and functional communication, and adaptive skills; at risk

range for attention problems and behavioral symptoms index, adaptive leadership and activities of

daily life, and developmental disorders and resiliency; and average for all other areas.  Tr. 186.

Carter indicated that the foregoing results showed little agreement between Claimant's teacher

and mother.[14]  Tr. 187.  Carter also indicated that Claimant displayed "more severe difficulties in

the domestic/community environment, suggesting that he is adapted to functioning at school than

he is at home."  Tr. 187.

The Adaptive Behavior Assessment System-Second Edition (ABAS-II), which measures

skills that are important to everyday life, was administered.  Tr. 191.  The ABAS-II scores were

based on a teacher form completed by his teacher Cathy Wunderle's November 10, 2009.  Tr.

191.  Claimant's General Adaptive Composite (GAC) was in the borderline range, with his

Conceptual and Practical Composite being in the in the low average range and his Social

Composites being in the extremely low range.  Tr. 191-192.  Carter noted that the form contained

a large number of guesses.  Tr. 191.  Therefore, he indicated that the results should be interpreted

with caution.  Tr. 191.

Claimant was found to be eligible for special education services, including

accommodations/modifications to the general curriculum in order to make adequate progress

towards age and grade level expectations and speech and language therapy, once each week.  Tr.

195.  It was stated that Claimant's eligibility was based on his full scale IQ score of 71 and

deficits in adaptive behavior in the areas of daily living skills, social skills and communication.

---

[14] Carter indicated that, "[d]ifferences in ratings often occur due to the subjective nature of this measure and the
different requirements/expectations of each environment/responder."  Tr. 187.

Tr. 195.  An IEP was put in place with an effective date of January 16, 2010.  Tr. 223-239.  On

November 9, 2010, an annual IEP review was performed with another review being scheduled for

November 8, 2011.  Tr. 272-290.

On October 7, 2011, when Claimant was in seventh grade, he was administered the STAR

Reading Test.  Tr. 256.  His Grade Equivalent score was 1.6, meaning that his test performance

was comparable to that of an average first grader after the sixth month of the school year.  Tr.

256.

### 2. Intervention specialist Christine Bundy's October 14, 2010, Teacher Questionnaire

On October 14, 2010, Christine Bundy, Intervention Specialist, completed a Teacher

Questionnaire.  Tr. 241-248.  At the time of completion, Claimant had been in Ms. Bundy's

classroom for six weeks.  Tr. 241.  Claimant's actual grade level was 6.  Tr. 241.  His reading

level was 2.0-2.5; his math level was 2.1; and his written language level was 2.0-2.5.  Tr. 241.

She indicated that Claimant was in a self-contained classroom, with a student/teacher ratio of 8:2.

Tr. 241.  Ms. Bundy saw Claimant for approximately six periods each day.  Tr. 241.

Ms. Bundy rated Claimant in the following areas: acquiring and using information;

attending and completing tasks; interacting and relating with others; moving about and

manipulating objects; caring for himself; medical conditions and medications/health and physical

well-being.[15]  Tr. 242-247.

In the area of acquiring and using information, Ms. Bundy stated that there were obvious

problems in each of the 10 subparts.  Tr. 242.

---

[15] In each area, there were multiple subparts that were rated based on the following scale: 1 – no problem; 2 – slight problem; 3 – obvious problem; 4 – serious problem; and 5 – a very serious problem.  Tr. 242-247.

13

In the area of attending and completing tasks, Ms. Bundy stated that there were no problems in 3 subparts, slight problems in 9 subparts, and obvious problems in 2 subparts.  Tr. 243.  The obvious problems were noted in the areas of completing class/homework assignments and working at a reasonable pace/finishing on time.[16]  Tr. 243.

In the area of interacting and relating with others, Ms. Bundy stated that there were no problems in 7 subparts, slight problems in 3 subparts, and obvious problems in 3 subparts.  Tr. 244.  The obvious problems were noted in the areas of making and keeping friends; introducing and maintaining relevant and appropriate topics of conversation; and taking turns in conversation.  Tr. 244.  When asked whether she was able to understand "very little," "no more than 1/2," "1/2 to 1/3," or "almost all" of Claimant's speech, Ms. Bundy indicated that she was able to understand almost all of his speech.  Tr. 245.

In the area of moving above and manipulating objects, Ms. Bundy stated that there were no problems.  Tr. 245.

In the area of caring for himself, Ms. Bundy stated that there were no problems in 8 subparts and an obvious problems in 1 subpart, identifying and appropriately asserting emotional needs.  Tr. 246. She noted that she did not know whether he had problems cooperating in, or being responsible for, taking needed medication.  Tr. 246.

In the area of health and physical well-being, Ms. Bundy did not rate Claimant but stated that Claimant suffered from depression; he could be quiet and withdrawn; had difficulties in social situations; and  needed encouragement to socialize with peers.  Tr. 247.

### III. Standard for Disability

The standard for evaluating a child's disability claim differs from that used for an adult.

---

[16] With respect to completing class/homework assignments, Ms. Bundy checked both the "slight problem" and "obvious problem" box.  Tr. 243.

42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 146, 147-148 (6th Cir. 2002). A child is considered disabled if he has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App. 1; 20 C.F.R. § 416.924(d).[17]

At Step Three, to determine whether a child's impairment *functionally* equals the Listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations[18] in two domains, or an "extreme" limitation[19] in one domain, the

---

[17] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.

[18] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." *Id.* "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id.*

[19] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked."

impairment *functionally* equals the listings and the child will be found disabled.  20 C.F.R. § 416.926a(d).

### IV. The ALJ's Decision

In his December 23, 2011, decision, the ALJ made the following findings:[20]

1.  Claimant was born in 1998 and was a school-age child[21] on November 27, 2009, the date of his application for SSI and is currently an adolescent.[22]  Tr. 21.

2.  Claimant has not engaged in substantial gainful activity since November 27, 2009, the application date.  Tr. 21.

3.  Claimant has the following severe impairments: borderline intellectual functioning; major depressive disorder, single episode, mild; mixed receptive and expressive language disorder; reading mathematics, and written expression disorders; and pervasive developmental disorder.  Tr. 21.

4.  Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments, including Listing 112.05 – Mental Retardation.  Tr. 21.

5.  Claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings. Tr. 21-31.  Claimant has a marked limitation in only one domain, acquiring and using information (Tr. 24-26) and less than marked limitation or no limitation in the other five domains (Tr. 26-31).

Based on the foregoing, the ALJ determined that Claimant had not been under a disability since November 17, 2009, the date the application was filed. Tr.  31.

---

*Id.*  "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

[20] The ALJ's findings are summarized herein.

[21] A "school-age child" includes children who are age 6 to attainment of age 12.  *See* 20 C.F.R. § 416.926a(g)(2)(iv).
[22] "[A]dolescents" includes children who are age 12 to attainment of age 18.  *See* 20 C.F.R. § 416.926a(g)(2)(v).

## V.  Parties' Arguments

### A.  Plaintiff's Arguments

First, Plaintiff asserts that the ALJ's finding that Claimant's impairments did not meet or equal Listing 112.05D (Mental Retardation) is not supported by substantial evidence.  Doc. 12, pp. 11-13.  Plaintiff argues that the ALJ failed to explain why he found that Claimant did not meet or equal Listing 112.05D.  Doc. 12, pp. 12-13.  Plaintiff asserts that there is evidence in the record to support a finding that the requirements of Listing 112.05 have been met but the ALJ failed to consider that evidence.  Doc. 12, pp. 12-13; Doc. 16, pp. 1-2.  For example, she asserts that Claimant has a verbal IQ score of 69 and additional limitations of depression and significant speech problems.  Doc. 12, pp. 12-13.

Second, Plaintiff argues that the ALJ's reliance upon the opinion evidence was misplaced and the opinion evidence could not serve as substantial evidence to support the ALJ's denial of disability benefits.  Doc. 12, pp. 13-14.  More particularly, she asserts that the ALJ improperly relied on state agency consultative psychologist Dr. Michael B. Leach's April 30, 2010, opinion because the ALJ misstated what Dr. Leach stated, Dr. Leach had not seen records after June 2010, and Dr. Leach had not seen a complete copy of the ETR.  Doc. 12, pp. 13-14.  Plaintiff also asserts that none of the other reviewing sources had the benefit of reviewing evidence developed after they provided their assessments in June 2010 and September 2010.  Doc. 12, p. 14.

### B.  Defendant's Arguments

Defendant argues that, although the ALJ did not state specific reasons for his finding that Claimant did not meet a Listing, a review of the ALJ's decision as a whole demonstrates that the ALJ properly considered the evidence and concluded that Claimant did not meet a Listing.  Doc. 15, pp. 13-14.  Defendant notes that no treating, examining, or reviewing source found that

Claimant met or equaled a Listing.  Doc. 15, p. 13.  Further, Defendant argues that there is no evidence that Claimant's reported shyness was a symptom of depression or that Claimant has significant limitations in the area of interacting with others.  Doc. 15, pp. 11-12.  Defendant also argues that Plaintiff has failed to demonstrate that Claimant has "significant speech problems" such that his functioning was significantly limited.  Doc. 15, p. 12.

In response to Plaintiff's second argument, Defendant asserts that the ALJ properly weighed and considered the opinion evidence, including the opinion of the consultative examining psychologist Dr. Leach and the state agency reviewing physicians.  Doc. 15, pp. 15-16. Defendant asserts that, since there is no absolute requirement that a non-treating source's opinion must be based on a complete case record, the ALJ did not err in relying on the opinion evidence in the record even though those opinions may have been rendered without the benefit of reviewing the entire record.  Doc. 15, p. 16.  Further, the Commissioner adds that the ALJ's decision demonstrates that the ALJ considered the examinations and evaluations that Plaintiff argues occurred after the physicians rendered their opinions.  Doc. 15, p. 16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  An

"ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d 931, 939-940 (6th Cir. 2011) (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).

## A.    Reversal and remand is not warranted for further Step Three analysis

Plaintiff asserts that the ALJ erred at Step Three by finding that the Claimant did not *meet or equal* Listing 112.05D and/or that the ALJ erred by failing to adequately explain the basis of his finding that Claimant did not *meet or equal* Listing 112.05D.[23]  Doc. 12; Doc. 16.

To qualify as disabled under Listing 112.05, a claimant needs to satisfy both the diagnostic description in the introductory paragraph of the Listing and at least one of the six sets of criteria found in Subparts A through F.  *See* 20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.00 (indicating that "Listing 112.05 (Mental Retardation) contains six sets of criteria.  If an impairment satisfies the diagnostic description in the introductory paragraph and any one of the six sets of criteria, we will find that the child's impairment meets the listing.") (Emphasis supplied); *see also Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 2013 WL 5539382, * 2 (N.D. Ohio Oct. 7, 2013) (to meet the level of severity required by Listing 112.05, "a claimant must meet the introductory requirement as well as at least one of the six subsets listed in paragraphs A through F"); *see also Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001) (when determining whether a claimant has met Listing 12.05, "[a] claimant must demonstrate that her impairment

---

[23] The Court notes that, at the administrative hearing, Plaintiff's counsel suggested that the issue was really "more of an equaling than meeting" Listing 112.05 because Claimant has a full scale IQ of 71 and "[t]hat listing requires a 70 full scale IQ; and he's also suffering from depression." Tr. 42. However, Plaintiff now argues that there is evidence that Plaintiff *meets* Listing 112.05.  Also, Plaintiff's counsel suggested at the hearing that Claimant's condition might *functionally equal* a Listing because Claimant had marked impairments in acquiring and using information and interacting and relating to others.  However, in her Brief Plaintiff presents no specific argument with respect to the ALJ's finding that Claimant also did not have an impairment or combination of impairments that functionally equaled a Listing.  To the extent that Plaintiff has raised issues with respect to the ALJ's reliance upon the opinion evidence in concluding that Claimant's impairment or combination of impairments did not functionally equal a Listing, the Court has addressed those arguments in Section VI.B. below.

satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder.").

To facilitate meaningful judicial review, "[a]n administrative law judge must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listing Impairment." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 415-416 (6th Cir. 2011).  However, "it is the claimant's burden to show that he meets or medically equals an impairment in the Listings." *Todd v. Astrue*, 2012 WL 2576435, * 9 (N.D. Ohio 2012) (internal citations omitted), *report and recommendation adopted*, 2012 WL 2576282 (N.D. Ohio 2012).

At Step Three, the ALJ considered Claimant's impairments under Listing 112.05.  Tr. 21.  The ALJ concluded that, "[t]he claimant's cognitive impairment has been considered under the requirements of listing 112.05 Mental Retardation, but the specific findings required by this section are not present in this record." Tr. 21.

Listing 112.05D – Mental Retardation is "[c]haracterized by subaverage general intellectual functioning with deficits in adaptive functioning" and the presence of "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."[24]  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.05D.

Plaintiff argues that there is evidence in the record to demonstrate that Claimant satisfies the criteria under Subpart D of 112.05, i.e., that he has "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.05D.  Doc.

---

[24] Under Listing 112.05D, the Commissioner "will assess the degree of functional limitation the additional impairment(s) imposes to determine if it causes more than minimal functional limitations, i.e., is a "severe" impairment(s) as defined in § 416.924(c)."  20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 112.00.

12, p. 12; Doc. 16, pp. 3-4.    Plaintiff points to Claimant's October 14, 2009, WISC-IV verbal comprehension score of 69 (Tr. 179) and asserts that Claimant has additional impairments of depression and significant speech problems through sixth grade.  Doc. 12, p. 12.   With respect to the IQ score, Plaintiff asserts that the ALJ only referred to the full scale IQ score of 71, not the verbal IQ score of 69 and argues that the ALJ's failure to use the lower verbal score was error. Doc. 12, p. 12.

Plaintiff is correct that the ALJ did not include a discussion of the IQ scores in the section regarding whether Claimant *met or medically equaled* a Listing.  However, when discussing whether Claimant *functionally equaled* a Listing, the ALJ referred to the ETR from September 2009 (Exhibit 11E, Tr. 177-222) which included the WISC-IV IQ test results.  Tr. 25.  The ALJ proceeded to note Claimant's full scale IQ score of 71 and acknowledge that Claimant's verbal comprehension scores were "extremely low."  Tr. 25.  As noted in the ETR, Claimant's verbal IQ score of 69 fell into the "extremely low range."  Tr. 179.  Thus, contrary to Plaintiff's suggestion, the ALJ's discussion of the ETR and Claimant's verbal comprehension score demonstrates that he did not ignore Claimant's verbal IQ score of 69.

Further, although the record may support Plaintiff's claim that Claimant had a verbal IQ score which satisfied one of the criteria in Subpart D of Listing 112.05, the burden remains with the Claimant to demonstrate that he satisfies all of the requirements of a Listing. *Todd*, 2012 WL 2576435, * 9.   Subpart D also requires that Claimant have a physical or other mental impairment that imposes an additional and significant limitation.  Additionally, Plaintiff must also satisfy the diagnostic description in the introductory paragraph to Listing 112.05, i.e., that Claimant has "subaverage general intellectual functioning with deficits in adaptive functioning."[25]

---

[25] "Adaptive functioning describes a claimant's effectiveness in various areas, including social skills, communication, and daily living skills, as well as 'how well the claimant meets the standards of personal independence and social

Plaintiff argues in a somewhat conclusory manner that, because Claimant "has the additional limitation of depression which causes his shyness, his inability to make friends and his limitations in the areas of interacting with others . . . [and] he had significant speech problems through the sixth grade and was receiving speech and language therapy through fifth and sixth grade after his mother applied for benefits," Claimant satisfies the additional Subpart D requirement. Doc. 12, p. 12.  However, Plaintiff fails to fully articulate how these other impairments cause significant limitations of function or what evidence in the record supports such a claim. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

Moreover, even if Plaintiff could demonstrate that the Subpart D requirements are met, Plaintiff has presented <u>no</u> argument with respect to how Claimant satisfies the diagnostic description.  The ALJ determined that Claimant suffers from borderline intellectual functioning[26] (Tr. 21) and, while a diagnosis of borderline intellectual functioning rather than mental retardation may not be dispositive of whether the Listing has been met, a diagnosis of borderline intellectual functioning is relevant in determining whether a claimant satisfies the diagnostic criteria.  *See Cooper v. Comm'r of Soc. Sec.*, 217 Fed Appx. 450, * 452 (6th Cir. 2007) (drawing a distinction between a diagnosis of mental retardation and one of borderline intellectual functioning when assessing whether a claimant had met the diagnostic description in Listing 12.05); *West v. Comm'r Soc. Sec,* 240 Fed. Appx. 692, 698–699 (6th Cir.2007) (suggesting that a diagnosis of borderline

---

responsibility of his . . . age by his . . . cultural group." *Barnett ex rel. D.B. v. Comm'r of Soc. Sec.*, 2013 WL 5539382, * 3 (N.D. Ohio Oct. 7, 2013).

[26] This finding is supported by diagnoses offered by more than one physician, including examining, treating and reviewing physicians.  Tr. 303 (consultative examining physician Dr. Leach); Tr. 390 (treating psychiatrist Dr. Dass); Tr. 305 (state agency reviewing physician); Tr. 367 (state agency reviewing physician).

intellectual functioning is relevant when determining whether a claimant has shown deficits in adaptive functioning under Listing 12.05).  Additionally, the fact that none of the physicians who offered diagnoses of borderline intellectual functioning concluded that Claimant met a Listing lends further support to the ALJ's determination that Claimant did not meet Listing 112.05D.

"No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Todd*, 2012 WL 2576435, *10 (quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 20*05)).  Although Plaintiff suggests that Claimant meets or equals Listing 112.05D, Plaintiff has failed to demonstrate how Claimant satisfies <u>all</u> the requirements of Listing 112.05, including the diagnostic description.[27]  Thus, since Plaintiff has not demonstrated that remand for further articulation at Step Three is likely to lead to a different result, remand is not warranted. *See Todd*, 2012 WL 2576435, *10 (declining to remand for a more complete Step Three analysis where the claimant had not shown that evidence that claimant had put forth could meet a Listing); *see Malone v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 470, 472 (6th Cir. 20*12) (finding that the claimant had the burden of demonstrating that his impairments equaled a Listing but claimant had not argued at the administrative hearing that he had a listed impairment and the ALJ's Step Three finding was supported by substantial evidence).

Plaintiff also argues that the ALJ's decision is flawed because the ALJ's Step Three reasoning cannot be followed.  Here, while the ALJ could have provided more detail at Step Three when assessing whether Claimant's impairment(s) *met or medically equaled* a Listing, the ALJ made clear that he assessed Claimant's impairment(s) under Listing 112.05 – Mental

---

[27] As noted above, at the administrative hearing, Plaintiff appeared to acknowledge that Claimant's condition may not meet a Listing but suggested that Claimant's impairment might medically equal or functionally equal a listed impairment.  Tr. 42.  While Plaintiff pointed to his depression and argued for functional equivalency, Plaintiff did not argue how Claimant met the "deficits in adaptive functioning" portion of Listing 112.05.

Retardation.  Tr. 21.  Further, the ALJ's decision, when viewed as a whole, contains a thorough discussion of the evidence, including Claimant's treatment records, opinion evidence, daily activities, and educational records.  Tr. 21-31.  The ALJ reviewed Claimant's treatment records, including those that relate to Claimant's allegations of depression, shyness and speech issues. Tr. 22-28.  For example, the ALJ indicated that "Dr. Leach observed the claimant to be sitting quietly in the waiting room, and he appeared to be happy, pleasant and somewhat shy but cooperative." Tr. 22; 301.  The ALJ noted that Dr. Leach indicated that Claimant's "speech was 100 percent intelligible." Tr.  22; 302.  The ALJ noted that, on January 11, 2011, Dr. Nanat Lopez-Cordova, PsyD., "reported that the claimant presented as shy and withdrawn; however, he was cooperative and seemed interested in sharing his thoughts and feelings."  Tr. 23; 424-425.  Additionally, as noted by the ALJ, "[f]ollow up visits with Dr. Lopez in May and June 2011 indicated the claimant was becoming more verbal and active, and more open to sharing his feelings."  Tr. 23; 394; 404. The ALJ indicated that the records reflect that, during a June 28, 2011, evaluation with child psychiatrist Kamal-Neil S. Dass, D.O., although Plaintiff indicated that Claimant's moods were up and down and he was still "off by himself," the Claimant disagreed with his mother and denied bring depressed.  Tr. 23; 389-390.  During Dr. Dass's June 28, 2011, evaluation, it was noted that Claimant's grades had improved from Ds to Bs and Cs, his teachers had no complaints and the Claimant was reportedly doing all of his class work and homework and was promoted to the 7th grade.  Tr. 26; 389-390.  Also, when assessing Claimant's degree of limitation in *interacting and relating with others*, the ALJ stated in part, "Medical records clearly show that the claimant needs improvement in his social skills, but there is no indication that he has a marked impairment in this area."  Tr. 28.

Since the ALJ's decision provides sufficient analysis and information to determine that no reasonable administrative fact finder would have resolved the matter differently, this Court

concludes that the ALJ's failure to provide a more detailed analysis when assessing whether Claimant *met or equaled* Listing 112.05D is harmless error. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (finding that *Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1996) did not categorically reject the application of harmless error analysis in the context of a step three finding); *see also Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339, *10 (N.D. Ohio June 17, 2011) (finding that the ALJ's lack of a full discussion at Step Three was harmless error because the ALJ's findings at Step Four provided sufficient information for the Court to determine that no reasonable administrative fact finder would have resolved the matter differently); *but see Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011) (concluding that the ALJ's Step Three evaluation was insufficient and not harmless error because the ALJ's Step Three analysis failed to provide an evaluation of the evidence necessary to facilitate meaningful judicial review).

Accordingly, Plaintiff's request for reversal and remand based on the ALJ's Step Three analysis is without merit.[28]

## B. The ALJ's reliance upon the consultative and reviewing physicians' opinion evidence was proper

It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 416.927.[29] 20 C.F.R. § 416.927(e)(2). Federal regulations establish the hierarchy of

---

[28] Although not fully articulated, Plaintiff also suggests that the ALJ failed in his Listing analysis because he did not call a medical expert. Doc. 12, p. 13. Plaintiff's argument is without merit. An ALJ is not required to call a medical expert. *Davis v. Chater*, 1996 U.S. App. LEXIS 33614, *6 (6th Cir. 1996) (citing 20 C.F.R §§ 404.1527(f)(2), 416.927(f)(2)). Where an ALJ has not abused his or her discretion, failure to call a medical expert does not preclude a court from finding substantial evidence to support an ALJ's decision. *Id.* Where the record contains sufficient evidence for an ALJ to decide a disability claim absent expert medical testimony, a failure to solicit expert medical testimony will not serve as a basis to reverse an ALJ's decision. *See Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (finding that because the record contained the claimant's extensive medical history, the ALJ did not err in not soliciting expert medical testimony). Here, the record contains sufficient evidence for the ALJ to have decided Claimant's disability claim. Therefore, the ALJ cannot be said to have erred in not calling a medical expert in this case.

[29] Those factors include the examining and/or treatment relationship, length, nature and extent of treatment

25

medical opinion evidence.  At the top of the hierarchy are opinions provided by the claimant's treating source.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 416.927(c)(2).  Opinions from these sources are entitled to controlling weight so long as the opinion is well supported by acceptable medical evidence and not inconsistent with the other substantial evidence of record. *Wilson*, 378 F.3d at 544.  Next in the hierarchy are opinions issued by examining physicians. 20 C.F.R. § 416.927(c).  Finally, the adjudicator must consider the findings of non-examining physicians. 20 C.F.R. § 416.927(e).  Opinions from non-examining physicians are not entitled to any special degree of deference.  *Id.*  However, the regulations recognize that opinions from non-examining state agency consultants may be entitled to significant weight, as these individuals are "highly qualified" and are "experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i).

### 1.  Consultative examining psychologist Dr. Leach

Plaintiff argues that the ALJ misstated what Dr. Leach said in his opinion.  Doc. 12, p. 13.  She argues that the ALJ incorrectly stated that "Dr. Leach opined that DCP's IQ score of 71 placed him in the borderline intellectual functioning range (Tr. 23)." Doc. 12, p. 13.  Plaintiff also asserts that, because Dr. Leach indicated that he had only seen two pages of the ETR, it cannot be said for certain whether Dr. Leach saw the results of the WISC-IV IQ test.  Doc. 12, p. 13.  Defendant argues that Plaintiff misstates what the ALJ said with respect to Dr. Leach's opinion.  Doc. 15, p. 15.  Defendant asserts that what the ALJ actually said was "Dr. Leach diagnosed borderline intellectual functioning (Tr. 23)."  Doc. 15, p. 58.

In making their respective arguments, both Defendant and Plaintiff have apparently overlooked the fact that the ALJ made two statements regarding Dr. Leach's opinion that

---

relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization. 20 C.F.R. § 416.927(c)(1)-(6).

Claimant suffered from borderline intellectual functioning.  In line with Plaintiff's assertion, the ALJ stated "Dr. Leach noted that he only received two pages of the claimant's 2009 school evaluation (see below) but he did opine that claimant's IQ score of 71 placed him in the range of borderline intellectual functioning.  Tr. 22.  Also, as asserted by Defendant, the ALJ stated "Dr. Leach diagnosed borderline intellectual functioning."  Tr. 23.

In his April 30, 2010, opinion, Dr. Leach noted that he had only seen 2 pages of the ETR and diagnosed Claimant with borderline intellectual functioning.  Tr. 301, 303.  While he did not specifically state that Claimant had an IQ score of 71, Dr. Leach made various references to Claimant's IQ.  For example, Dr. Leach stated, "I only received 2 pages of the ETR from school and thus, I was not privy to the entire evaluation results, but can note that he is of borderline intellectual functioning." Tr. 301.  Dr. Leach also stated that Claimant's mother indicated that Claimant "has an IEP through the school for his academic struggles and I only received 2 pages of the entire ETR such that the only thing that I can comment on is his IQ, which the WISC-IV indicates borderline IQ." Tr. 303.  Additionally, Dr. Leach stated, "He is functioning within the borderline range of intellectual ability on the previously administered WISC-IV which is viewed as a valid representation of his intellectual ability[;]" (Tr. 302); "[h]is ability to abstract was low, but consistent with prior IQ measurements[;]" (Tr. 303); his "level of insight and judgment into his situation is adequate, and he is able to engage in age-appropriate tasks for his IQ level" (Tr. 303).

Dr. Leach's references to Claimant's IQ throughout his report along with his statement that the only thing that he could comment on from the ETR was Claimant's IQ scores demonstrate that, when rendering his opinion that Claimant suffered from borderline intellectual functioning, Dr. Leach was aware of the WISC-IV IQ test results, which included among other scores, Claimant's full scale IQ score of 71 and verbal comprehension score of 69.  Tr. 179.

27

Thus, because the ALJ's statements with respect to what Dr. Leach opined are not inconsistent with the record, Plaintiff's request for a reversal and remand based on the fact that the ALJ incorrectly indicated that Dr. Leach actually referenced Claimant's IQ score of 71 when rendering his opinion is without merit.

Plaintiff also takes issue with the ALJ's reliance upon Dr. Leach's opinion because Dr. Leach had not seen school/educational records dated after Dr. Leach's April 30, 2010, opinion, including intervention specialist Christine Bundy's evaluation, IEPs from late 2010 and 2011, behavioral mental health evaluations from 2011, and testing from seventh grade showing that Claimant was reading at a first grade level.  Doc. 12, p. 13.  The ALJ gave "some weight [to Dr. Leach's opinion], as it [is] consistent with the medical evidence as a whole."  Tr. 24.

Although Dr. Leach may not have reviewed the records that post-dated his opinion, Plaintiff provides no legal authority for the proposition that the ALJ therefore improperly considered or weighed that decision.  In fact, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)).  "The opinions need only be 'supported by evidence in the case record,'" *Helm*, 405 Fed. Appx. at 1002, and  Plaintiff has failed to articulate how Dr. Leach's opinion is not supported by the medical evidence as a whole.[30]

Moreover, Plaintiff has not argued nor demonstrated that the ALJ did not consider the later developed evidence and the ALJ's decision makes clear that the ALJ considered both

---

[30] In support of her argument that the ALJ improperly considered or relied on Dr. Leach's opinion, in her Reply Brief, Plaintiff argues that, "If Dr. Leach's finding that the Plaintiff has a valid verbal IQ of 69 is 'consistent with the medical evidence as a whole,' then the ALJ should have found that the IQ requirement of Listing 112.05(D) was met."  Doc. 16, p. 4.  To the extent that Plaintiff is attempting to argue that Dr. Leach's opinion is not supported by the evidence, her argument is confusing and at odds with her earlier argument regarding the ALJ's consideration of Dr. Leach's opinion.  For example, Plaintiff first argued that it could not be said that Dr. Leach had seen or reviewed the WISC-IV IQ scores but now seems to argue that that Dr. Leach found that Claimant had a valid IQ score of 69.

medical records and educational records that were developed after Dr. Leach issued his opinion. Tr. 23-24, 25-26.  *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that developed after the issuance of those opinions); *see also Pence v. Comm'r of Soc. Sec.*, 2014 WL 1153704, *13 (N.D. Ohio Mar. 20, 2014) (finding no error where the ALJ explained that weight was given to non-treating physicians' opinions because they were generally consistent with evidence of record and where the ALJ considered relevant evidence that was developed after the issuance those opinions).

Based on the foregoing, even though the ALJ incorrectly indicated that Dr. Leach specifically referred to an IQ score of 71 and although Dr. Leach had not reviewed the entire case record prior to rendering his opinion, the ALJ did not err in providing some weight Dr. Leach's opinion and relying on that opinion to support his decision.

### 2. State agency reviewing physicians

Plaintiff takes issue with the ALJ's reliance upon the opinions of the state agency reviewing physicians because they were rendered in June and September of 2010 and thus they had not reviewed evidence from 2011 or evidence prior to September 2010 that was not submitted until after the issuance of their opinions.  Doc. 12, p. 14.  The Commissioner asserts that the ALJ afforded appropriate weight to the opinion evidence and properly considered the evidence that arose following the issuance of the various medical opinions.  Doc. 15, pp. 14-16.

The ALJ gave great weight to the opinions of the three state agency consultants, John Moromol, M.D., Frank Orosz, Ph.D., and Melissa Hall, M.A., CCC/SLP, because he concluded that those opinions were consistent with both the medical and education records in the case.[31]  Tr.

---

[31] When providing weight to the state agency reviewing physicians' opinion, the ALJ did not specifically reference the September 2010 Childhood Disability Evaluation Form.  However, the state agency reviewers who issued the

24.  Although the state agency reviewing physicians' opinions were not based on a review of the entire record, Plaintiff has failed to demonstrate that the ALJ did not fully consider the entire record, including those records not available to the state agency consultants at the time they rendered their opinions.  Nor has the Plaintiff argued or demonstrated that the state agency consultants' opinions are not supported by the record.

Thus, for the reasons more fully set forth above with respect to Dr. Leach's opinion, the ALJ did not err in providing great weight to the opinions of the three state agency consultants, John Moromol, M.D., Frank Orosz, Ph.D., and Melissa Hall, M.A., CCC/SLP.  *See Helm*, 405 Fed. Appx. at 1002; *McGrew*, 343 Fed. Appx. at 32; *Pence*, 2014 WL 1153704 at *13.

## VII. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

Dated: March 28, 2014

Kathleen B. Burke
United States Magistrate Judge

---

September 2010 Childhood Disability Evaluation Form as part of Claimant's request for reconsideration affirmed the assessment in the June 2010 Childhood Disability Evaluation Form.  Tr. 372.